UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-23366

FLORIDA DEMOCRATIC PARTY,
JANE W. MOSCOWITZ, and JUAN-
CARLOS "JC" PLANAS,

      *Plaintiffs*,

vs.

CORD BYRD, in his official capacity
as Florida Secretary of State; and
ASHLEY MOODY, in her official
capacity as Florida Attorney General,

      *Defendants*.

_____/

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

     Plaintiffs, the Florida Democratic Party, Jane W. Moscowitz, and Juan-Carlos "JC" Planas,

through their counsel, sue Defendant Cord Byrd, in his official capacity as Florida Secretary of State,

and Defendant Ashley Moody, in her official capacity as Florida Attorney General. In support,

Plaintiffs state as follows:

INTRODUCTION

    1.     This suit seeks injunctive and declaratory relief because the newly amended Fla. Stat.

§ 101.5614(8) chills core First Amendment activity by vaguely and overbroadly threatening severe

criminal sanctions against any authorized person who observes a county canvassing board during

the canvassing of an election for discussing things they observe at an open public meeting.

    2.     Political parties, campaigns, and other organizations routinely send people—often

volunteers—to county canvassing boards to observe the canvassing of elections. These volunteers

have traditionally reported back to their volunteer groups engaged in voter protection or election oversight, political parties, campaigns, or organizations. These reports are integral to the prevention of wrongful voter disenfranchisement and to ensure that elections are run freely, fairly, and in accordance with law.

3.    The problem arises from an amendment, earlier this year, of Fla. Stat. § 101.5614(8), making it a felony for any person "authorized to observe, review, or inspect ballot materials or observe canvassing" to "release any information about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county."

4.    It is wholly unclear what "release" means in this context. Additionally, the criminalization of the release of "any information" about votes cast is both vague and overbroad.

5.    This could expose volunteer members of the public to criminal prosecution for simply exercising their First Amendment rights. Moreover, a political campaign seeking to file a lawsuit for redress against a county canvassing board for misapplication of the voter intent standards—relatively routine and appropriate election-related activity— could face similar prosecution for simply advocating for the proper application of the law.

6.    During the 2022 Primary Election, at least one lawyer for a supervisor of elections in Florida gave a public warning about the language in the newly amended Section 101.5614(8) to all observers at every canvassing board meeting. This created a chilling effect where volunteers were not only unwilling to share information about what they had observed, but also expressed discomfort with continuing to volunteer to observe the work of county canvassing boards.

7.    Seeking to minimize the uncertainty, the Florida Democratic Party sought an advisory opinion on an expedited basis from the Florida Secretary of State, Division of Elections, shortly after the 2022 Primary Election was certified. Yet, to date, the Division of Elections has not provided any

response to that request.

8.      As a result, the Florida Democratic Party can only proceed with its canvassing board oversight program during the 2022 General Election and in all future elections, under threat of criminal sanctions, despite the fact that the party has operated such a program in counties across the State of Florida during elections for many years. Other organizations, including the Republican Party of Florida, have also operated programs to monitor the conduct of county canvassing boards.

9.      If the Florida Democratic Party is unable to run a canvassing board oversight operation, it will be unable to ensure that the canvassing boards properly oversee elections. Moreover, the party cannot subject its volunteers to potential criminal liability just for reporting what takes place at a public meeting of a county canvassing board.

## JURISDICTION AND VENUE

10.      This action arises under the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1983 and 1988. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.      Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims have occurred or will occur in the Southern District of Florida.

13.      Defendants are not entitled to Florida's home venue privilege. The home venue privilege "is merely a state procedural rule, it does not bind a federal court. Rather, federal law controls the question of proper venue." *Young v. Corizon LLC*, 4:18-CV-444-RH/MJF, 2019 WL 2587813, at *4 (N.D. Fla. May 21, 2019), *report and recommendation adopted,* 4:18CV444-RH-

MJF, 2019 WL 2583156 (N.D. Fla. June 24, 2019). Additionally, the home venue privilege does not apply, because, *inter alia*, Plaintiffs' constitutional rights have already been violated by state action in the county and district where this suit is instituted, and they are in real and imminent danger of continued invasion in the county and district where this suit is instituted. *See Scott v. Thompson*, 326 So. 3d 123, 126–27 (Fla. 1st DCA 2021); *Jacksonville Elec. Auth. v. Clay Cnty. Util. Auth.*, 802 So. 2d 1190, 1192–93 (Fla. 1st DCA 2002); *Barr v. Fla. Bd. of Regents*, 644 So. 2d 333, 335–36 (Fla. 1st DCA 1994); *Graham v. Vann*, 394 So. 2d 178, 180 (Fla. 1st DCA 1981); *Dep't of Transp. v. Morehouse*, 350 So. 2d 529, 533 (Fla. 3d DCA 1977).

14.     All conditions precedent to bringing this action, if any, have occurred, have been waived, or would be a useless act and are accordingly waived.

15.     Plaintiffs are entitled to recover reasonable attorneys' fees and costs under, *inter alia*, 42 U.S.C. § 1988 for proceedings in vindication of civil rights.

**PARTIES**

16.     Plaintiffs have standing to pursue this pre-enforcement action as to the newly amended Fla. Stat. § 101.5614(8). The newly amended statute creates an Article III injury because Plaintiffs intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution since Plaintiffs' alleged conduct is at least arguably forbidden by the pertinent law. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1076–77 (N.D. Fla. 2021).

***Florida Democratic Party***

17.     Plaintiff, Florida Democratic Party (sometimes referred to as the "FDP") is the official Democratic Party organization for the State of Florida. The FDP is a political organization governed by Florida law. Fla. Stat. § 103.091. It is permitted to observe meetings of county

canvassing boards. *See, e.g.,* Fla. Stat. § 102.141. The FDP is properly positioned to "assert its own rights as a political party and also the rights of its candidates and voters." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078-79 (N.D. Fla. 2004).

18.     The FDP operates a voter protection team, which serves as a bulwark against voter suppression across the State of Florida by working to ensure that every eligible voter is entitled to cast a ballot and have that ballot counted. **Exhibit A,** Declaration of Sam Koplewicz at ¶ 5.

19.     The FDP Voter Protection Director works closely with volunteer voter protection team members across the State of Florida, most of whom are attorneys, so that they can observe the election for the benefit of the FDP and Democratic Party candidates. *Id.* at ¶ 6. Among other things, this includes ensuring that voter protection team members observe as many county canvassing board meetings as possible, in as many counties as possible, to ensure that the canvassing boards are administering the election properly and in accordance with law. *Id.* at ¶ 7.

20.     The only real way for the FDP and Democratic Party candidates to ensure that canvassing boards are administering the election properly and in accordance with law is to have voter protection team members present at canvassing board meetings, so that they can observe the proceedings and report those observations back to the voter protection team. *Id.* at ¶ 9. This free flow of communication enables the FDP and Democratic Party candidates to determine how to best handle incidents that may occur during the canvassing of the election. *Id.*

21.     For example, if a canvassing board were to make a decision about the validity of a cast ballot which is, or arguably is, in violation of law, the FDP will only become aware of that decision if the observer reports it, freely and with sufficient detail. *Id.* at ¶ 10. How the FDP and Democratic Party candidates react to such violations of law, or arguable violations of law, is

necessarily impacted by the amount of detail in the report, as well as the frequency of similar reports both within a single county and across multiple counties. *Id.*

22.     It is only through the free flow of communication between observers and the voter protection team that the FDP and Democratic Party candidates can meaningfully determine whether and how to instruct observers to object to certain decisions of a canvassing board. *Id.* at ¶ 11.

23.     Additionally, it is only through the free flow of communication between observers and the voter protection team that the FDP and Democratic Party candidates can meaningfully determine whether to file a lawsuit to seek redress for decisions of a canvassing board with which the FDP or a candidate disagrees. *Id.* at ¶ 12.

24.     The recent amendment to Fla. Stat. § 101.5614(8) has caused serious disruption and harm to the FDP's voter protection program during the 2022 Primary Election and will continue to cause disruption during the 2022 General Election and in other elections in the future, unless remedied. *Id.* at ¶¶ 14-15, 19-21.

25.     As a result of the amendment to Fla. Stat. § 101.5614(8) and its vague prohibitions and attendant criminal penalties, the FDP has notified voter protection team members across the State of Florida about the statutory amendment during volunteer training sessions, prior to those volunteers attending canvassing board meetings. *Id.* at ¶ 18.

26.     The FDP intends to continue to have volunteers attend canvassing board meetings, but it appears increasingly certain that the utility of such observation by volunteers will be reduced. *Id.* at ¶ 21.

27.     Additionally, the FDP's Voter Protection Director is deeply worried that he may become a subject of criminal investigation or prosecution, simply for discussing with canvasing board observers what they observed during their observation of canvassing board meetings to ensure that

the canvassing board meetings are run properly and in accordance with law. *Id.* at ¶ 22. This is especially true since he interacts with volunteers in many counties across Florida, and Fla. Stat. § 101.5614(8) may be subject to different, uncertain interpretations in different counties. *Id.*

### Jane W. Moscowitz

28.     Plaintiff, Jane W. Moscowitz, is a registered voter in Miami-Dade County, Florida, and a member of the FDP. **Exhibit B,** Declaration of Jane W. Moscowitz at ¶ 3. She is a member of The Florida Bar, having first been admitted to practice law in Florida on September 15, 1986. *Id.* at ¶ 4. She is admitted to practice in several federal courts, including the United States District Court for the Southern District of Florida, the United States Court of Appeals for the Eleventh Circuit, and the United States Supreme Court. *Id.* She obtained her law degree from Harvard Law School in 1977. *Id.*

29.     Moscowitz concentrates her legal practice in the areas of federal and state criminal defense and business litigation. *Id.* Earlier in her career, she was a federal prosecutor for almost ten years. *Id.* Her last government position was as Senior Litigation Counsel in the United States Attorney's Office for the Southern District of Florida. *Id.*

30.     Moscowitz believes very strongly in protecting the right to vote and works hard to combat voter suppression in Miami-Dade County and across the State of Florida. *Id.* at ¶ 5. Accordingly, she is a volunteer attorney member of the FDP voter protection team. *Id.* at ¶ 6.

31.     Moscowitz is also a co-chair of the Miami-Dade County Democratic Executive Committee ("Miami-Dade DEC") voter protection committee, which is comprised entirely of volunteers, nearly all of whom are attorneys. *Id.* at ¶ 7. Every member of the Miami-Dade DEC voter protection committee is also a member of the FDP voter protection team. *Id.* at ¶ 8. During major elections, the Miami-Dade DEC voter protection committee members serve in various capacities as

members of the FDP voter protection team. *Id.* One such capacity is attending and observing county canvassing board meetings. *Id.*

32. For many years and election cycles, Moscowitz has served as a volunteer member of the FDP voter protection team, in various capacities. *Id.* at ¶ 9. In 2018, she attended meetings of the county canvassing board on behalf of Democratic Party candidates involved in statewide recounts. *Id.*

33. Moscowitz volunteered to attend and observe county canvassing board meetings in 2022. *Id.* at ¶ 11. As a result, she attended multiple county canvassing board meetings during the 2022 Primary Election. *Id.* She understood her task at the canvassing board to be to observe the proceedings and to object to any acts or decisions of the canvassing board that she believed were not in accordance with the law and also to report any irregularities back to the rest of the voter protection team and to FDP, so that corrections to those irregularities could be proposed and enacted. *Id.*

34. Moscowitz has reviewed the current version of Fla. Stat. § 101.5614(8). *Id.* at ¶ 15. Despite her background, she does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes. *Id.* at ¶ 16.

35. As a result of the amendment to Fla. Stat. § 101.5614(8) and its vague prohibitions and attendant criminal penalties, Moscowitz refrained from sharing with the voter protection team all the information about what she observed at canvassing board meetings. *Id.* at ¶ 17.

36. Moscowitz intends to continue to volunteer for the FDP voter protection team by attending and observing county canvassing board meetings during the upcoming 2022 General Election and in other future elections. *Id.* at ¶ 19. However, as a result of the recently amended Fla. Stat. § 101.5614(8), she is deeply worried that she may inadvertently become a subject of criminal investigation or prosecution, simply for discussing what she observed during her volunteer

observation of canvassing board meetings to ensure that the canvassing board meetings are run properly and in accordance with law. *Id.*

### JC Planas

37.     Plaintiff, Juan-Carlos "JC" Planas, is a registered voter in Miami-Dade County, Florida, and a member of the FDP. **Exhibit C,** Declaration of Juan-Carlos "JC" Planas at ¶ 3. He is a member of The Florida Bar, having first been admitted to practice law in Florida on September 29, 1998. *Id.* at ¶ 4. He obtained his law degree from St. Thomas University School of Law in 1998. *Id.*

38.     Planas concentrates his legal practice in the areas of litigation and election law, including, among other things, court proceedings, actions before the Florida Election Commission, and other matters of representation of candidates for elected office. *Id.* His legal practice has often required him to appear at county canvassing board meetings on behalf of his candidate clients. *Id.*

39.     Planas teaches election law as an adjunct professor of law at St. Thomas University School of Law, and has done so since the Spring of 2016. *Id.* at ¶ 5. Prior to that, he taught state and local government law at St. Thomas University School of Law in the Fall of 2015. *Id.*

40.     Between 2002 and 2010, Planas represented District 115 in the Florida House of Representatives, as a registered member of the Republican Party of Florida ("RPOF"). *Id.* at ¶ 6.

41.     Planas remained a registered member of the RPOF until November of 2019. *Id.* at ¶ 7. When he was a Republican, Planas served in election and canvassing board oversight as both a volunteer and as a paid, retained attorney acting on behalf of Republican Party organizations and candidates for elected office. *Id.* at ¶ 8.

42.     In 2020, Planas became a registered Democrat. *Id.* at ¶ 7. Since becoming a Democrat, he has continued to appear before canvassing boards, only now he does so on behalf of the FDP and Democratic Party candidates. *Id.* at ¶ 9. In some capacities, he has appeared as a

volunteer, and in other capacities, he has appeared as a paid, retained attorney on behalf of his candidate clients. *Id.*

43.     Planas believes very strongly in protecting the right to vote and works hard to combat voter suppression in Miami-Dade County and across the State of Florida. *Id.* at ¶ 10. Accordingly, he is a volunteer attorney member of the FDP's voter protection team. *Id.* at ¶ 11.

44.     Planas's task at the canvassing board is, and has long been, to observe the proceedings and to object to any acts or decisions of the canvassing board that he believes are not in accordance with the law and also to report any irregularities back to the FDP voter protection team or to his candidate clients, as the case may be, so that corrections to those irregularities may be proposed and enacted. *Id.* at ¶ 13.

45.     Planas attended and observed multiple canvassing board meetings during the 2022 Primary Election, in both volunteer and non-volunteer capacities. *Id.* at ¶ 14.

46.     Planas has reviewed the current version of Fla. Stat. § 101.5614(8). *Id.* at ¶ 18. Despite his background, he does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes. *Id.* at ¶ 19.

47.     As a result of the amendment to Fla. Stat. § 101.5614(8) and its vague prohibitions and attendant criminal penalties, Planas has been scared to share with anyone else—including the FDP voter protection team and his candidate clients—all the information about what he observed at canvassing board meetings. *Id.* at ¶ 20.

48.     The inability to freely communicate also burdens Planas's law practice because his financial livelihood requires the free exchange of information with his clients, including candidates for elected office. *Id.* at ¶ 23.

49.     Planas intends to appear at, and observe, canvassing board meetings, both as a volunteer for the FDP voter protection team and as a paid, retained attorney on behalf of his candidate clients, during the upcoming 2022 General Election and in other future elections. *Id.* at ¶ 24. However, he is deeply worried that he may become a subject of criminal investigation or prosecution, simply for discussing what he observed during his observation of canvassing board meetings to ensure that the canvassing board meetings are run properly and in accordance with law. *Id.*

### *Secretary of State Cord Byrd*

50.     Defendant Cord Byrd is Florida's Secretary of State. He is sued in his official capacity. Secretary Byrd is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.

51.     Secretary Byrd is Florida's chief elections officer. Fla. Stat. § 97.012. As head of the Department of State, Secretary Byrd is responsible for the "general supervision and administration of the election laws . . . ." Fla. Stat. § 15.13. The Secretary of State must "obtain and maintain the uniformity in the interpretation and implementation of the election laws." Fla. Stat. § 97.012(1). Secretary Byrd has the duty to follow and enforce federal and state laws as they pertain to elections and to provide instruction to local election officials regarding carrying out such laws. Florida law therefore vests Secretary Byrd with the authority to "adopt by rule uniform standards" for the "interpretation and implementation of chapters 97 through 102 and 105 of the Election Code." *Id.* Moreover, both the Florida Division of Elections, which is tasked with overseeing Florida's elections, and the Florida Office of Election Crimes and Security, which is tasked with investigating election crimes, are divisions within the control of the Secretary of State. Fla. Stat. §§ 20.10, 97.022.

52.     The Florida Office of Election Crimes and Security was established in 2022 pursuant to Fla. Stat. § 97.022. "The Office of Election Crimes and Security is created within the Department of State. The purpose of the office is to aid the Secretary of State in completion of his or her duties

under s. 97.012(12) and (15) by: (a) Receiving and reviewing notices and reports generated by government officials or any other person regarding alleged occurrences of election law violations or election irregularities in this state [and] (b) Initiating independent inquiries and conducting preliminary investigations into allegations of election law violations or election irregularities in this state." Fla. Stat. § 97.022(1). "The office may review complaints and conduct preliminary investigations into alleged violations of the Florida Election Code or any rule adopted pursuant thereto and any election irregularities." Fla. Stat. § 97.022(2). "By January 15 of each year, the department shall submit a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives detailing information on investigations of alleged election law violations or election irregularities conducted during the prior calendar year. The report must include the total number of complaints received and independent investigations initiated and the number of complaints referred to another agency for further investigation or prosecution, including the total number of those matters sent to a special officer pursuant to s. 102.091." Fla. Stat. § 97.022(2). Accordingly, the Florida Office of Election Crimes and Security has the power to receive and investigate complaints into alleged violations of the Florida Election Code, and the power to make referrals to law enforcement agencies for prosecution of alleged violations of the Florida Election Code. Moreover, the Florida Office of Election Crimes and Security is obligated to report its conduct on an annual basis to the Governor and the chief officers of both the Florida Senate and House of Representatives.

53.     Secretary Byrd is an appropriate Defendant in this case. This suit addresses a provision of the Florida Election Code within his purview, and which is also criminal in nature, such that it is within the purview of the Florida Office of Election Crimes and Security, thereby permitting an office under Secretary Byrd's direction to receive complaints about the Act and to investigate alleged violations of the Amended Law.

### *Attorney General Ashley Moody*

54.     Defendant Ashley Moody is the Attorney General of Florida. She is sued in her official capacity. Attorney General Moody is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. She serves as the State's chief legal officer. Fla. Const. Art. IV, § 4(b). The Florida Constitution creates the Office of the Statewide Prosecutor under Attorney General Moody's oversight and control. *Id.* That Office has concurrent jurisdiction with the state attorneys "to prosecute violations of criminal laws occurring or having occurred, in two or more judicial circuits as part of a related transaction, or when any such offense is affecting or has affected two or more judicial circuits as provided by general law." *Id.* Such authority is interpreted broadly. *See Scott v. State*, 102 So. 3d 676, 677 (Fla. 5th DCA 2012); *King v. State*, 790 So. 2d 477, 478 (Fla. 5th DCA 2001). Attorney General Moody is responsible for enforcement of the Act and is therefore an appropriate defendant in this case.

## GENERAL ALLEGATIONS

55.     A recent amendment to Fla. Stat. § 101.5614(8), a provision of the Florida Election Code, creates criminal penalties to members of the public who observe canvassing board proceedings using vague and overbroad language that threatens to chill core speech related to the oversight of elections and county canvassing boards.

56.     Prior to the amendment which went into effect earlier this year, Fla. Stat. § 101.5614(8) stated that "[a]ny supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, or election employee who releases the results of any election prior to the closing of the polls in that county on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."

57.     However, Fla. Stat. § 101.5614(8) was amended in 2022. The amended version

which went into effect in 2022 will be referred to herein as the "Amended Law." The Amended

Law provides as follows:

> Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, election employee, or *__other person authorized to observe, review, or inspect ballot materials or observe canvassing who releases any information about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county on election day commits a felony of the third degree__*, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(emphasis added).[1]

58.     The pre-amendment version of Section 101.5614(8) prohibited county elections

officials from releasing the results of an election before the end of election day. That longstanding

prohibition served, and continues to serve, the salutary purpose of ensuring against the premature

release of election results by those clothed with government authority.

59.     Such canvassing board and election oversight efforts are buttressed by the fact that

canvassing board meetings are open to the public under Florida law, and because voted ballots

(including those which are subject to review by a canvassing board), are public records under

Florida law. As one court put it, "[n]othing could be more obvious than that a ballot becomes a public

record once it is voted." *Rogers v. Hood*, 906 So. 2d 1220, 1223 (Fla. 1st DCA 2005). It is therefore

---

[1] The amendment is contained in chapter 2022-73, section 18 of the Laws of Florida, which provides, in pertinent part as follows:

> (8) Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, ~~or~~ election employee, or other person authorized to observe, review, or inspect ballot materials or observe canvassing who releases any information about votes cast for or against any candidate or ballot measure or any ~~the~~ results of any election before ~~prior to~~ the closing of the polls in that county on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

a shocking disruption for the Florida Democratic Party and its volunteers to fear criminal sanctions as a result of sharing information about public meetings and public record materials.

60.     Members of the public have historically been permitted to observe the pre-election day public meetings of county canvassing boards and were free to speak about their observations of this integral government activity. Political parties, campaigns, candidates, and good-government advocates alike have grown accustomed to fielding volunteers to attend canvassing board meetings both to observe the proceedings and to share with the group for whom they volunteered their observations about the progress of the election and any problems or controversies that may have arisen in the canvassing process.

61.     For instance, a campaign or party may have a legitimate interest in keeping track of the number of times a canvassing board determines that a ballot bearing some marking near the name of its candidate does or does not constitute a valid vote for that candidate or that candidate's opponents. Likewise, a campaign or party may have a legitimate interest in monitoring whether canvassing boards' applications of the voter intent standards are being applied in a fair and uniform manner, both within a single county and across different counties.

62.     The Amended Law expanded the prohibition on released information from "the results" of the election to the results of the election or "any information about votes cast for or against any candidate or ballot measure." This restriction, if applied to authorized persons' communication of their observations with the political campaign, candidate, or political party for whom they are observing, could prohibit authorized persons from relaying how the canvassing board ruled on the intent of a voter when it determined voter intent on ballots appearing before a canvassing board.

63.     Additionally, the statute may prohibit authorized members of the public who observe publicly noticed and open canvassing board meetings from discussing what they observed.

64.     The Amended Law is vague, overbroad, and chilling, including its use of the word "release." It was unambiguous in the pre-amendment context that the word "release" meant to disseminate the results of an election outside of the government officials charged with administering the election.

65.     In the Amended Law, the release prohibition extends beyond government officials to other authorized persons. As such, it is unclear whether the word "release" might be construed more broadly to cover authorized persons merely sharing information they observed at the canvassing board meeting with the public, or the political party, campaign, or candidate for whom they are volunteering. At least one lawyer for a supervisor of elections has informally advised that the law could be construed that broadly.

66.     The Amended Law is also vague because the phrase "any information about votes cast for or against any candidate or ballot measure" is unbounded. Depending on how broadly a prosecutor construes that language, even statements about cast ballots that do not identify the candidate could be criminal. This leads to absurd results since, for example, even an observer's statement that a canvassing board rejected every ballot which came before it on a given day, or even a statement that the canvassing board met and ruled on the validity of cast ballots, could arguably be construed as "any information about votes cast for or against" a candidate or ballot measure.

67.     The Amended Law is also vague because it is unclear who an "authorized" person is, as it arguably criminalizes speech about public meetings by members of the public who are permitted to observe canvassing board proceedings, including members of the Florida Democratic

Party who have, *and have not*, volunteered to participate in the party's election oversight efforts. It may even be a felony for the public to discuss what they observe in public government meetings streamed and archived on the Internet because some canvassing board meetings are streamed live over the Internet. *E.g.,* **Exhibit M,** Broward, 10/17/22. And, some canvassing board meetings are even archived on government websites for the public to observe long after they have ended. *See* **Exhibit N**, Broward Canvassing Bd. Meeting Archive, https://www.browardvotes.gov/Canvassing-Board-Meetings/Canvassing-Board-Meetings-Archives (last accessed Oct. 13, 2022). As written, the Amended Law could arguably result in the prosecution of members of the public just for discussing what they observe in public government meetings streamed and archived on the Internet.

68.     The Amended Law is clearly overbroad insofar as it criminalizes the "release" of "any information" by "authorized" persons about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county.

69.     The Amended Law fails to give people of common intelligence fair notice of what the law demands of them. As just a few examples:

a.      Plaintiff Moscowitz does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite the fact that she has been a Harvard-educated attorney for more than 45 years, with most of her legal practice focused on the practice of criminal law, both as a federal prosecutor and as a criminal defense attorney. Moscowitz Decl. at ¶ 16.

b.      Plaintiff Planas does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite the fact that he served four terms in the Florida Legislature, despite the fact he has taught election law or state and local government law as an adjunct professor at St. Thomas University School of Law for

approximately seven years, and despite the fact that he has been an attorney for more than 24 years, with a substantial portion of his legal practice focused on the practice of election law. Planas Decl. at ¶ 19.

c.      And, the FDP's Voter Protection Director, Sam Koplewicz, does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite the fact that he is a Harvard-educated lawyer who is well acquainted with Florida election law due to his having worked on the voter protection team's staff for multiple election cycles in Florida. Koplewicz Decl. at ¶ 17.

70.     The Amended Law is vague and overbroad because it is unclear whether its only temporally restrictive language – "before the closing of the polls in that county on election day" – applies just to the prohibition against the release of "any results of any election," or whether it also applies to the prohibition against the release of "any information about votes cast for or against any candidate or ballot measure." The Amended Law says that any person "who releases any information about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county on election day commits a felony of the third degree." This language contains insufficient punctuation to reveal the meaning of the Legislature's chosen words. Grammatically, the temporal restriction may apply either only to the release of election results, or to every act the Amended Law prohibits.

71.     The Amended Law is both vague and overbroad because the phrase "any information about votes cast for or against any candidate or ballot measure" is unbounded, leading to absurd results. The language arguably encompasses communication of anything related to a canvassing board's action. Arguably, even the statement that a canvassing board accepted, as valid, every vote that came before it on a given day; or even simply that a canvassing board met and

ruled on the validity of cast votes, could be construed as "any information about votes cast for or against any candidate or ballot measure."

72. The Amended Law also amounts to an impermissible content-based restriction in violation of the First Amendment. The Amended Law's prohibition of the "release" of "any information about votes cast for or against any candidate or ballot measure or any results of any election" is a content-based restriction because the purpose of the statute is to stifle speech of a particular content The law is not narrowly tailored and serves no compelling interest which would warrant this restriction on speech.

73. During the Primary Election in August 2022, at least one lawyer for a supervisor of elections gave verbal warnings to everyone present at every canvassing board meeting about the changes in the Amended Law, which has had a chilling effect on volunteer participation in the FDP and its affiliated campaigns' canvassing board oversight operations. It has also had a chilling effect on the exchange of information between volunteers, and between volunteers and the FDP and its affiliated campaigns' election oversight personnel. *See* Moscowitz Decl.; Planas Decl.; Koplewicz Decl.

74. In that regard, the Amended Law has already shut down private exchanges of information and it threatens to continue to do so.

75. Broadly prohibiting authorized observers from sharing their observations, including with the political parties or campaigns they are volunteering for, raises serious First Amendment concerns. A restriction on speech related to elections must "'not *significantly impinge* on constitutionally protected rights.'" *Citizens for Police Accountability Political Cmte. v. Browning*, 572 F.3d 1213, 1221 (11th Cir. 2009) (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)) (emphasis added). Because the Amended Law facially restricts authorized observers from

sharing their observations, it *does* significantly impinge upon their right of free speech.

76.     The Amended Law blatantly violates the concept that, in our system of "government in which the citizenry is the final judge of the proper conduct of public business," "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official . . . records open to public inspection." *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) (holding freedom of the press protected the media's truthful publication of court documents open to the public).

77.     During the August 2022 Primary Election, concerns about the Amended Law, and its attendant serious criminal penalties, have already chilled members of the public from volunteering to attend canvassing board meetings in Florida on behalf of the FDP.

78.     It has also chilled the FDP's efforts to maintain a canvassing board operation for fear of inadvertently exposing volunteers to criminal liability for merely passing along their observations to lawyers monitoring the conduct of the election.

79.     In the case of Plaintiff JC Planas, the Amended Law's chilling effect also threatens his financial livelihood as an election law attorney who represents candidates before county canvassing boards.

*The State Failed to Respond to the FDP's*
*Request for an Advisory Opinion*

80.     On September 7, 2022, shortly after the 2022 Primary Election was certified, counsel for the Florida Democratic Party sent a request for an advisory opinion regarding the Amended Law to the Florida Division of Elections pursuant to Fla. Stat. § 106.23(2) and Fla. Admin. Code. R. 1S-2.010. The Florida Division of Elections is an office within the Florida Department of State. Fla. Stat. § 20.10(2)(a).

81. Advisory opinions issued by the Department of State, Division of Elections, have "the effective force of state law or official policy." *League of Women Voters of Florida, Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1213–14 (N.D. Fla. 2018). Supervisors of elections "reasonably understand the state's chief election officer's opinions as how he 'interpret[s] and [is] likely to enforce Florida's election laws.'" *Id.*

82. The FDP's September 7, 2022 request for an advisory opinion sought guidance about the Amended Law so that the party and its affiliated campaigns and volunteers would know what the Amended Law does and does not prohibit, specifically as it relates to what has traditionally been a core part of the party's and campaigns' volunteer election monitoring programs.

83. The request for an advisory opinion posed two questions to the Division of Elections:

> 1. What information about votes cast for or against any candidate or ballot measure may an authorized person communicate privately, prior to the closing of the polls in the county in which the person is authorized, with other authorized persons volunteering or working on behalf of the same political party, candidate, or campaign?

> 2. What information about votes cast for or against any candidate or ballot measure may an authorized person communicate publicly prior to the closing of the polls in the county in which the person is authorized?

**Exhibit D**.

84. The Division of Elections has previously held that its advisory opinions cannot declare statutes unconstitutional. *See* Division of Elections Opinion 13-05 (Mar. 25, 2013). Cognizant of that restriction, the FDP's request for an advisory opinion invited an interpretation of the Amended Law which minimized its attendant harm by protecting volunteers from the threat of criminal prosecution, the party's ability to operate a meaningful canvassing board oversight operation, and First Amendment freedoms. The FDP requested that the Division of Elections respond with an advisory opinion on an expedited basis, in accordance with Fla. Admin. Code. R. 1S-2.010(4)(i).

85.     On September 8, 2022, the Director of the Division of Elections confirmed receipt of the request for an advisory opinion.

86.     On September 29, 2022, after follow-up from the FDP, the Division of Elections responded: "We coordinate with the General Counsel's Office on advisory opinions whom you copied on your email. We will let you know as soon as we can on the status." **Exhibit E**.

87.     As of the date this lawsuit is filed, the Division of Elections has yet to respond to the request for an advisory opinion. Therefore, the FDP and its members, candidates, and volunteers, including Plaintiffs Moscowitz and Planas, are left to guess whether participation in a volunteer program to ensure a free and fair election could amount to a felony.

*County Canvassing Boards Are*
*Imminently Meeting Across the State*

88.     Voters across Florida have already begun to vote. This means that county canvassing boards across the state are set to meet imminently to review voted ballots in the presence of the public.

89.     Pursuant to Fla. Stat. § 101.68(2)(a), county canvassing boards "may begin the canvassing of vote-by-mail ballots upon the completion of the public testing of automatic tabulating equipment pursuant to s. 101.5612(2)," commonly referred to as "logic and accuracy testing."

90.     The referenced statute, Fla. Stat. § 101.5612(2) provides that logic and accuracy testing may take place "[o]n any day not more than 25 days before commencement of early voting . . . ." In turn, Fla. Stat. § 101.657 establishes that "[e]arly voting shall begin on the 10th day before an election that contains state or federal races," and that "[i]n addition, early voting may be offered at the discretion of the supervisor of elections on the 15th, 14th, 13th, 12th, [or] 11th . . . day before an election that contains state or federal races . . . ."

91.     In light of the foregoing, a county which begins early voting on the earliest permissible date would have been eligible to convene county canvassing boards as early as September 30, 2022.

92.     Counties across Florida are imminently convening their canvassing boards. For example:

a.      In Alachua County, logic and accuracy testing is scheduled for October 14, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 17, 2022. **Exhibit F**.

b.      In Broward County, logic and accuracy testing took place on September 29, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 17, 2022. **Exhibit G**.

c.      In Hillsborough County, logic and accuracy testing took place on October 6, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 20, 2022. **Exhibit H**.

d.      In Miami-Dade County, logic and accuracy testing is scheduled for October 19, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 20, 2022. **Exhibit I**.

e.      In Palm Beach County, logic and accuracy testing took place on October 12, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 17, 2022. **Exhibit J**.

f.      In Pinellas County, logic and accuracy testing is scheduled for October 17, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 19, 2022. **Exhibit K**.

g.      In Osceola County, logic and accuracy testing is scheduled for October 14, 2022, and the canvassing board is scheduled to begin meeting to determine issues such as voter intent on October 19, 2022. **Exhibit L**.

93.     The FDP and its affiliated campaigns are in the final stages of recruiting and scheduling volunteers like Plaintiffs Moscowitz and Planas, to observe their local county canvassing boards during the canvassing of the 2022 General Election. Yet, the FDP and its affiliated campaigns have been unconstitutionally burdened in these efforts to due to the Amended Law's chilling effects.

## COUNT I – VIOLATION OF THE FIRST AMENDMENT
## TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

94.     Plaintiffs, on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members, repeat and incorporate by reference each allegation contained in paragraph numbers 1–93 as if fully set forth herein.

95.     The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the State of Florida from, in relevant part, "abridging the freedom of speech . . . or of the right of the people to . . . . petition the Government for a redress of grievances."

96.     "A State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'" *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

97.     A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

98.     The Amended Law is vague and overbroad, and a substantial number of its applications are unconstitutional, in violation of Plaintiffs' First Amendment rights to speech and

to petition the government for redress of grievances.

99.     The Amended Law is unconstitutionally vague and overbroad and not narrowly tailored to serve a legitimate government interest. By expanding Fla. Stat. § 101.5614(8)'s prohibition on 'released' information from "the results" of the election by county elections personnel, to the results of the election or "any information about votes cast for or against any candidate or ballot measure," by county elections personnel or anyone authorized to observe the proceedings, the Amended Law risks impermissibly criminalizing the protected First Amendment activity of volunteers seeking to ensure the integrity of the election. It also impinges on political parties' and campaigns' rights to meaningfully monitor the election. And, it does so in a vague and unbounded fashion, such that no canvassing board observer could reliably predict what conduct is lawful, and what conduct is felonious.

100.    The Amended Law has resulted in irreparable constitutional harm by chilling, and threatening to chill, Plaintiffs' protected rights, both on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members. The Amended Law discourages would-be observers from participating, or meaningfully participating, in canvassing board observation for fear that they may be arrested or prosecuted for violating the Amended Law's vague and ambiguous offenses.

101.    The Amended Law has already led the Plaintiffs and FDP's members to self-censorship and will continue to do so.

102.    The Amended Law also amounts to an impermissible content-based restriction in violation of the First Amendment. Its prohibition of the "release" of "any information about votes cast for or against any candidate or ballot measure or any results of any election" is a content-based restriction because the purpose of the statute is to stifle speech of a particular content The law is

not narrowly tailored and serves no compelling interest which would warrant this restriction on speech.

103.    The Amended Law arguably restricts the free speech rights of members of the public just observing an open, public government meeting, whether at home or remotely, and whether live or recorded.

104.    Not only does this unconstitutionally impinge on Plaintiffs' rights to protected speech, but it also impinges on the freedom to petition the Government for a redress of grievances, especially where a major reason that canvassing board oversight exists in the first instance is so that political parties and candidates may object to canvassing boards' election determination decisions, whether before the canvassing board itself, or in court. Criminalizing the sharing of information about what was observed before a canvassing board unreasonably burdens the right to petition the Government for redress of a grievance because it chills the ability for such information to make its way to the appropriate decisionmakers, including party or campaign attorneys.

105.    The Amended Law is not narrowly tailored to achieve a compelling government interest. Indeed, unlike the previous version of Fla. Stat. § 101.5614(8), which only prohibited county elections personnel from prematurely releasing the election results, the newly added portions of the Amended Law serve no legitimate purpose whatsoever.

106.    As to the prohibition against authorized observers 'releasing' "any information about votes cast for or against any candidate or ballot measure," such information is vital to a meaningful election transparency effort. The prohibition against authorized observers prematurely 'releasing' the results of the election also serves no legitimate purpose, because, unlike county elections personnel, such individuals are not in any position to know the results of the election

before they are publicly released. For these reasons, the Amended Law's principal purpose and result is simply to discourage people from observing canvassing boards.

107.    Each of the Defendants is responsible for enforcing the Amended Law.

108.    By acting under color of state law to deprive Plaintiffs of their First Amendment rights, Defendants have violated 42 U.S.C. § 1983.

109.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their rights to speech and to petition the government for redress of grievances, and other expressive conduct as guaranteed by the First Amendment.

## COUNT II – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)

110.    Plaintiffs, on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members, repeat and incorporate by reference each allegation contained in paragraph numbers 1–93 as if fully set forth herein.

111.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits the State of Florida from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

112.    A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

113.     The Amended Law is impermissibly vague and overbroad because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement of the Amended Law.

114.     Because Fla. Stat. § 101.5614(8)'s expanded prohibition on 'released' information—from "the results" of the election by county elections personnel, to the results of the election or "any information about votes cast for or against any candidate or ballot measure," by county elections personnel or anyone permitted to observe the proceedings—is vague and overbroad, the Amended Law fails to provide fair notice to ordinary people seeking to serve as statutorily authorized canvassing board observers regarding their exposure to potential criminal liability by merely discussing with someone else what they observed, potentially regardless of who that person may be. The Amended Law invites arbitrary enforcement where it can be construed very broadly by some law enforcement officers or courts, and very narrowly by others.

115.     Plaintiffs, both on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members, have already been and will continue to be discouraged from lawful participation in canvassing board oversight operations for fear of arbitrary enforcement and severe criminal penalties under the Amended Law.

116.     Because the Amended Law is vague and standardless, it has resulted in irreparable constitutional harm by violating Plaintiffs' constitutional rights, to due process under the Fourteenth Amendment, both on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members.

117.     Each of the Defendants is responsible for enforcing the Act.

118.     By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

119.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights.

### COUNT III – DECLARATION THAT FLA. STAT. § 101.5614(8) IS UNCONSTITUTIONAL UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (28 U.S.C. § 2201 and 2202)

120.    Plaintiffs, on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members, repeat and incorporate by reference each and every allegation contained in this Complaint above, including those in Counts I and II, as if fully set forth herein.

121.    An actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning the Plaintiffs' rights and obligations with regard to Fla. Stat. § 101.5614(8), both on behalf of themselves and, in the case of the FDP, also on behalf of its candidates and members.

122.    Plaintiffs seek a declaratory judgment from this Court that Fla. Stat. § 101.5614(8) is unconstitutional under the First and/or Fourteenth Amendments, as set forth in Counts I and II to this Complaint, and that Plaintiffs, on behalf of themselves and, in the case of the FDP, its candidates and members, may participate fully and freely in canvassing board oversight operations in the same manner and fashion as they were able to prior to the 2022 amendment to Fla. Stat. § 101.5614(8), without fear that any of their communications with any other person relating to a canvassing board proceeding will result in arrest, criminal investigation, prosecution, or any other mechanism of enforcement of Fla. Stat. § 101.5614(8).

123.    Plaintiffs have a substantial interest in the rights and obligations of Fla. Stat. § 101.5614(8), have equitable or legal rights affected by of Fla. Stat. § 101.5614(8), and require judicial confirmation as to their rights, title, status, and interests, and are entitled to have their rights validated by the Court.

124.     There is a bona fide, actual, present practical need for the declaration.

125.     The declaration involves a present, ascertained, or ascertainable state of facts or present controversy as described in this Complaint.

126.     The powers, privileges, or rights of the Plaintiffs are dependent upon the facts and the law applicable to the facts as set forth in this Complaint.

127.     The Defendants, through actions, practice, and positions, have shown an interest that is actual, present, adverse, and antagonistic to the Plaintiffs' respective rights and interests described in the Complaint.

128.     The Defendants' antagonistic and adverse interests are before the Court by proper process.

129.     The relief sought is not merely the giving of legal advice by the Court or the answer to questions propounded from curiosity.

130.     A declaratory judgment and injunctive relief are strongly in the public interest for the reasons set forth in this Complaint.

131.     Moreover, Defendants will incur no burden if the relief sought here is granted because the requested relief will not affect the operations of any of the Defendants, or of any other elections or law enforcement personnel in the State of Florida. Additionally, even if the relief sought here were to cause any burden on the Defendants, such burden does not outweigh the benefits to issuing the requested relief where the subject statute is unconstitutional.

132.     Declaratory and injunctive relief preserves rights under the United States Constitution and laws, and upholds the requirements of the United States Constitution, including numerous rights under the penumbra of the First and Fourteenth Amendments, as well as the rights of political parties and campaigns to ensure a free and fair election.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

a.　　　Declare that Fla. Stat. § 101.5614(8), as amended in 2022, is unconstitutional under the First and Fourteenth Amendments to the United States Constitution and that it is therefore a nullity, and that Fla. Stat. § 101.5614(8) is restored to its pre-amendment language;

b.　　　Enter a preliminary injunction, and thereafter a permanent injunction, (a) enjoining the Defendants, their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control, and all other persons within the scope of Federal Rule of Civil Procedure 65, from investigating, prosecuting, or otherwise enforcing Fla. Stat. § 101.5614(8), as amended in 2022, in any way, including as to its provisions which criminalize or otherwise impinge on the conduct of any "person authorized to observe, review, or inspect ballot materials or observe canvassing; and (b) permitting enforcement only of the pre-amendment version of Fla. Stat. § 101.5614(8);

c.　　　Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses, pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

d.　　　Grant any other relief as the Court may deem just and proper.

Respectfully submitted,

*Counsel for Plaintiffs*

/s/ Marc A. Burton
Marc A. Burton, Esq.
Florida Bar No. 95318
Richard J. Burton, Esq.
Florida Bar No. 179337
The Burton Firm, P.A.
2875 N.E. 191st Street, Suite 403
Aventura, Florida 33180
(305) 705-0888
pleadings@theburtonfirm.com
mburton@theburtonfirm.com
rb@theburtonfirm.com

and

Mark Herron, Esq.
Florida Bar No. 199737
Messer Caparello P.A.
2618 Centennial Place
Tallahassee, Florida 32308
(850) 222-0720
mherron@lawfla.com
*Application for Admission to the Southern
District of Florida Bar filed and pending*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2022, a true and correct copy of the foregoing

was served via e-mail to the individuals on the attached service list.

/s/ Marc A. Burton
Marc A. Burton, Esq.

**SERVICE LIST**

Marc A. Burton, Esq.
Richard J. Burton, Esq.
The Burton Firm, P.A.
2875 N.E. 191st Street, Suite 403
Aventura, Florida 33180
pleadings@theburtonfirm.com
mburton@theburtonfirm.com
rb@theburtonfirm.com
*Counsel for Plaintiffs*

Mark Herron, Esq.
Messer Caparello P.A.
2618 Centennial Place
Tallahassee, Florida 32308
mherron@lawfla.com
*Counsel for Plaintiffs*

Bradley M. McVay, Esq.
General Counsel
Florida Department of State
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399
brad.mcvay@dos.myflorida.com
*Counsel for Defendant Cord Byrd,*
*in his official capacity as Florida Secretary of State*

Defendant Ashley Moody
via the Office of the Attorney General
PL-01 The Capitol
400 South Monroe Street
Tallahassee, Florida 32399
oag.civil.eserve@myfloridalegal.com
*Counsel for Defendant Ashley Moody,*
*in her official capacity as Florida Attorney General*