**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:22-cv-23366-WILLIAMS/REID**

**FLORIDA DEMOCRATIC PARTY,** *et al.***,**

     *Plaintiffs,*

**vs.**

**CORD BYRD,** *et al.***,**

     *Defendants.*

_____/

**PLAINTIFFS' EXPEDITED MOTION FOR**
**PRELIMINARY INJUNCTION, WITH**
**INCORPORATED MEMORANDUM OF LAW**

Respectfully submitted,

Marc A. Burton, Esq.
Florida Bar No. 95318
The Burton Firm, P.A.
2875 N.E. 191st Street, Suite 403
Aventura, Florida 33180
(305) 705-0888
pleadings@theburtonfirm.com
mburton@theburtonfirm.com

A 2022 amendment to Fla. Stat. § 101.5614(8) arguably makes it a felony for a volunteer who observes a county canvassing board meeting to "release" "any information" about the board's decision that a ballot was validly cast for a candidate. Similarly, a campaign that sues a canvassing board for misapplication of voter intent standards could face prosecution just for advocating for proper application of the law. Absent injunctive relief, Section 101.5614(8) will continue to chill core First Amendment activity by vaguely threatening criminal sanctions against anyone who observes a canvassing board during the 2022 General Election and all future elections, just for discussing things they observe at an open, public meeting. The Florida Democratic Party ("FDP") sought an advisory opinion about the new law from the State of Florida, hoping to avoid the need for a lawsuit, but the State failed to respond. Accordingly, Plaintiffs FDP, Jane W. Moscowitz and JC Planas seek a preliminary injunction to maintain the status quo *before* the amended law's criminalization of First Amendment freedoms went into effect, and/or an order to show cause why such relief should not issue. Plaintiffs further state as follows:

I.      **RELEVANT FACTS**

Political parties, campaigns, and other organizations routinely recruit people—usually volunteers—to attend county canvassing board meetings to observe the canvassing of elections. This serves a critical role in ensuring that canvassing boards properly apply the law and do so with uniformity. As such, volunteers have traditionally observed canvassing board meetings and reported any irregularities, or the lack thereof, to their volunteer groups engaged in voter protection or election oversight, political parties, campaigns, or organizations. Various organizations, including the FDP, rely on the information provided by volunteer canvassing board observers. Others like election lawyer JC Planas not only volunteer for such tasks, but also financially rely on the ability to freely discuss canvassing board proceedings.

### A.      2022 Amendment to Fla. Stat. § 101.5614(8) and Chilling of Protected Speech

Prior to a recent 2022 amendment, Fla. Stat. § 101.5614(8) stated that "[a]ny supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, or election employee who releases the results of any election prior to the closing of the polls in that county on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084." That prohibition served the salutary purpose of ensuring against the premature release of election results by those clothed with government authority.

However, the recently amended Fla. Stat. § 101.5614(8) now creates criminal penalties for those who observe canvassing board proceedings, using vague and overbroad language which chills core speech related to the oversight of elections and county canvassing boards. It provides as follows:

> Any supervisor of elections, deputy supervisor of elections, canvassing board member, election board member, election employee, or ***other person authorized to observe, review, or inspect ballot materials or observe canvassing who releases any information about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county on election day commits a felony of the third degree***, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(emphasis added). The amended Section 101.5614(8) will be referred to as the "Amended Law."

Canvassing boards meet in open, public meetings. *E.g.*, Fla. Stat. § 102.141(2)(a) (requiring that canvassing boards meet "in a building accessible to the public . . . to publicly canvass" ballots); Fla. Stat. § 286.011 (stating all meetings of any county board at which official acts are to be taken are "declared to be public meetings open to the public at all times"). Members of the public are therefore permitted to observe canvassing boards' pre-Election Day public meetings, and were traditionally free to speak about their observations of this integral government activity. Political parties, campaigns, candidates, and good-government advocates alike have grown accustomed to sending volunteers to attend and observe canvassing board meetings, to share with the group for whom they volunteered their observations about the progress of the election and any problems, or

lack thereof, that may have arisen in the canvassing process. For instance, a campaign may have a legitimate interest in keeping track of the number of times a canvassing board determines that a ballot bearing some marking near the name of its candidate does or does not constitute a valid vote for that candidate or her opponents. Likewise, a political party may have a legitimate interest in monitoring whether canvassing boards' applications of the voter intent standards are being applied in a fair and uniform manner, both within a single county and across different counties.

**B.    Fla. Stat. § 101.5614(8)'s Unconstitutional Chilling of Plaintiffs' Rights**

Concerns about the Amended Law, and its attendant serious criminal penalties, have already chilled members of the public from volunteering to attend canvassing board meetings in Florida on behalf of the FDP. The Amended Law has chilled the FDP's efforts to maintain a canvassing board operation for fear of inadvertently exposing volunteers to criminal liability for merely passing along their observations to lawyers monitoring the conduct of the election. The Amended Law has also unconstitutionally burdened the individual Plaintiffs and others.

During the August 2022 Primary Election, at least one lawyer for a supervisor of elections gave verbal warnings to everyone present at every canvassing board meeting about the Amended Law's changes. The Amended Law has created a chilling effect on volunteer participation in the FDP and its affiliated campaigns' canvassing board monitoring operations. It has also had a chilling effect on the exchange of information between volunteers, and between volunteers and the FDP and its affiliated campaigns' election oversight personnel. *See* **Exhibit A,** Decl. of Sam Koplewicz; **Exhibit B,** Decl. of Jane W. Moscowitz; **Exhibit C,** Decl. of Juan-Carlos "JC" Planas.

**1.    Florida Democratic Party**

The FDP operates a voter protection team, which is a bulwark against voter suppression across Florida by working to ensure that every eligible voter is entitled to cast a ballot and have that

ballot counted. **Exhibit C,** Koplewicz Decl. at ¶ 5. The FDP Voter Protection Director works with volunteers across the State, most of whom are attorneys, so they can observe the election for FDP and Democratic Party candidates. *Id.* at ¶ 6. This includes ensuring that team members observe as many canvassing board meetings as possible, in as many counties as possible, to ensure that canvassing boards are administering the election properly and in accordance with law. *Id.* at ¶ 7.

The only real way for the FDP and Democratic Party candidates to ensure that canvassing boards are administering the election properly and in accordance with law is to have voter protection team members present at canvassing board meetings, so that they can observe the proceedings and report those observations back to the voter protection team. *Id.* at ¶ 9. This free flow of communication enables the FDP and Democratic Party candidates to determine how to best handle incidents that may occur during the canvassing of the election. *Id.* For example, if a canvassing board were to make a decision about the validity of a cast ballot which is, or arguably is, in violation of law, the FDP will only become aware of that decision if the observer reports it, freely and with sufficient detail. *Id.* at ¶ 10. How the FDP and Democratic Party candidates react to such violations of law, or arguable violations of law, is necessarily impacted by the amount of detail in the report, as well as the frequency of similar reports both within a single county and across multiple counties. *Id.*

It is only through the free flow of communication between observers and the voter protection team that the FDP and Democratic Party candidates can meaningfully determine whether and how to instruct observers to object to certain decisions of a canvassing board. *Id.* at ¶ 11. And, it is only through the free flow of communication between observers and the voter protection team that the FDP and Democratic Party candidates can meaningfully determine whether to file a lawsuit to seek redress for decisions of a canvassing board with which the FDP or a candidate disagrees. *Id.* at ¶ 12.

The recent amendment to Fla. Stat. § 101.5614(8) has caused serious disruption and harm to

the FDP's voter protection program during the 2022 Primary Election and will continue to cause disruption during the 2022 General Election and in other elections in the future, unless remedied. *Id.* at ¶¶ 14-15, 19-21. As a result of the Amended Law's vague prohibitions and attendant criminal penalties, the FDP has notified voter protection team members across the State of Florida about the statutory amendment during volunteer training sessions, prior to those volunteers attending canvassing board meetings. *Id.* at ¶ 18. The FDP intends to continue to have volunteers attend canvassing board meetings, but it appears increasingly certain that the utility of such observation by volunteers will be reduced. *Id.* at ¶ 21. Additionally, the FDP's Voter Protection Director is deeply worried that he may become a subject of criminal investigation or prosecution, simply for discussing with canvasing board observers what they observed during their observation of canvassing board meetings to ensure that the meetings are run properly and in accordance with law. *Id.* at ¶ 22. This is especially true since he interacts with volunteers in many Florida counties, and Fla. Stat. § 101.5614(8) may be subject to different, uncertain interpretations in different counties. *Id.*

## 2. Jane W. Moscowitz

Plaintiff, Jane W. Moscowitz, is a registered voter in Miami-Dade County and a member of FDP. **Exhibit A,** Moscowitz Decl. at ¶ 3. She is a member of The Florida Bar, having first obtained her law degree from Harvard Law School in 1977. *Id.* at ¶ 4. *Id.* Moscowitz practices federal and state criminal defense and business litigation. *Id.* Earlier in her career, she was a federal prosecutor for almost ten years. *Id.* Her last government position was as Senior Litigation Counsel in the U.S. Attorney's Office for the Southern District of Florida. *Id.*

Moscowitz believes strongly in protecting the right to vote and works hard to combat voter suppression in Miami-Dade County and across the State of Florida. *Id.* at ¶ 5. Accordingly, she is a volunteer attorney member of the FDP voter protection team. *Id.* at ¶ 6. For many years and election

cycles, Moscowitz has served as a volunteer member of the FDP voter protection team. *Id.* at ¶ 9.

Moscowitz volunteered to attend and observe canvassing board meetings in 2022; as such, she attended multiple canvassing board meetings during the 2022 Primary Election. *Id.* at ¶ 11. She understood her task at the canvassing board to be to observe the proceedings and to object to any acts or decisions of the canvassing board that she believed were not in accordance with the law and also to report any irregularities back to the rest of the voter protection team and to FDP, so that corrections to those irregularities could be proposed and enacted. *Id.*

Moscowitz has reviewed the Amended Law but does not know, and cannot predict, what it permits, nor what it prohibits and criminalizes. *Id.* at ¶¶ 15-16. As a result of its vague prohibitions and attendant criminal penalties, she refrained from sharing with the voter protection team all the information about what she observed at canvassing board meetings. *Id.* at ¶ 17. Moscowitz intends to continue to volunteer for the FDP voter protection team by attending and observing county canvassing board meetings during the 2022 General Election and in other future elections. *Id.* at ¶ 19. However, she is deeply worried that she may inadvertently become a subject of criminal investigation or prosecution, simply for discussing what she observed during her volunteer observation of canvassing board meetings to ensure that they are run properly and in accordance with law. *Id.*

### 3. JC Planas

Plaintiff, Juan-Carlos "JC" Planas, is a registered voter in Miami-Dade County, and a member of FDP. **Exhibit B,** Planas Decl. at ¶ 3. He is a member of The Florida Bar, having first obtained his law degree from St. Thomas University ("STU") in 1998. *Id.* ¶ 4. He practices litigation and election law, and represents candidates for elected office. *Id.* His legal practice has often required him to appear at canvassing board meetings on behalf of his candidate clients. *Id.* Additionally, Planas teaches election law as an adjunct professor of law at STU, and has done so since the Spring of 2016;

prior to that, he taught state and local government law at STU in the Fall of 2015. *Id.* at ¶ 5.

From 2002 to 2010, Planas represented House District 115 in the Florida Legislature, as a registered member of the Republican Party of Florida. *Id.* at ¶ 6. Planas remained a registered Republican until November of 2019. *Id.* at ¶ 7. When he was a Republican, Planas served in election and canvassing board oversight as both a volunteer and as a paid, retained attorney acting on behalf of Republican Party organizations and candidates for elected office. *Id.* at ¶ 8.

In 2020, Planas became a registered Democrat. *Id.* at ¶ 7. Since becoming a Democrat, he has continued to appear before canvassing boards, only now he does so on behalf of the FDP and Democratic Party candidates. *Id.* at ¶ 9. In some capacities, he has appeared as a volunteer, and in other capacities, he has appeared as a paid, retained attorney on behalf of his candidate clients. *Id.* Planas believes very strongly in protecting the right to vote and works hard to combat voter suppression in Miami-Dade County and across the State of Florida. *Id.* at ¶ 10. Accordingly, he is a volunteer attorney member of the FDP's voter protection team. *Id.* at ¶ 11.

His task at the canvassing board is, and has long been, to observe the proceedings and to object to any acts or decisions of the canvassing board that he believes are not in accordance with law and also to report any irregularities back to the FDP voter protection team or to his candidate clients, as the case may be, so that corrections to those irregularities may be proposed and enacted. *Id.* at ¶ 13.

Planas has reviewed the Amended Law but he does not know, and cannot predict, what it permits, nor what it prohibits and criminalizes. *Id.* at ¶¶ 18-19. As a result of its vague prohibitions and attendant criminal penalties, he has been scared to share with anyone else—including FDP and his candidate clients—all the information about what he observed at canvassing board meetings. *Id.* at ¶ 20. The inability to freely communicate burdens Planas's financial livelihood, which requires the free exchange of information with his clients, including candidates for elected office. *Id.* at ¶ 23.

Planas intends to appear at, and observe, canvassing board meetings, both as a volunteer and as a paid, retained attorney on behalf of his candidate clients, during the 2022 General Election and in future elections. *Id.* at ¶ 24. However, he is deeply worried that he may become a subject of criminal investigation or prosecution, simply for discussing what he observed during his observation of canvassing board meetings to ensure that they are run properly and in accordance with law. *Id.*

### C. FDP Seeks Advisory Opinion from Division of Elections

On September 7, 2022, shortly after the Primary Election was certified, FDP requested an advisory opinion about the Amended Law from the Florida Department of State, Division of Elections, pursuant to Fla. Stat. § 106.23(2) and Fla. Admin. Code. R. 1S-2.010. The request sought guidance about the Amended Law, as it relates to what has been a core part of the party's and campaigns' volunteer election monitoring programs. The request, **Exhibit D,** posed two questions:

1. What information about votes cast for or against any candidate or ballot measure may an authorized person communicate privately, prior to the closing of the polls in the county in which the person is authorized, with other authorized persons volunteering or working on behalf of the same political party, candidate, or campaign?

2. What information about votes cast for or against any candidate or ballot measure may an authorized person communicate publicly prior to the closing of the polls in the county in which the person is authorized?

The Division of Elections' advisory opinions have "the effective force of state law or official policy." *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1213–14 (N.D. Fla. 2018). However, they cannot declare statutes unconstitutional. *See* Div. of Elections Op. 13-05 (Mar. 25, 2013). Therefore, FDP's request invited an interpretation which minimized the Amended Law's harm by protecting volunteers from the threat of prosecution, the party's ability to meaningfully operate a canvassing board monitoring program, and First Amendment freedoms. FDP requested that the Division respond on an expedited basis, pursuant to Fla. Admin. Code. R. 1S-2.010(4)(i).

On September 29, 2022, after follow-up from the FDP, the Division said "[w]e will let you

know as soon as we can on the status." **Exhibit E**. Yet, as of the date this lawsuit is filed, the Division has yet to respond to the request for an advisory opinion. Therefore, the FDP and its members, candidates, and volunteers, including Moscowitz and Planas, are left to guess whether participation in a volunteer program to ensure a free and fair election could amount to a felony.

### D. County Canvassing Boards Are Imminently Meeting Across the State

Voting in the 2022 General Election has begun. Canvassing boards across Florida are set to meet imminently to review voted ballots in the presence of the public, including many during the week of October 17, 2022. *See, e.g.,* **Exhibit F** (Alachua, 10/17); **Exhibit G** (Broward, 10/17); **Exhibit H** (Hillsborough, 10/20); **Exhibit I** (Miami-Dade, 10/20); **Exhibit J** (Palm Beach, 10/17); **Exhibit K** (Pinellas, 10/19); **Exhibit L** (Osceola, 10/19). The FDP and candidates' campaigns are recruiting and scheduling volunteers like Moscowitz and Planas to observe their local canvassing boards but these efforts have been burdened by the Amended Law's chilling effect.

## II. LEGAL ANALYSIS

### A. Plaintiffs have standing

Plaintiffs have standing to pursue this pre-enforcement action. The Amended Law's threatened enforcement creates an Article III injury because Plaintiffs, as well as the FDP's members, candidates, and volunteers, intend to engage in conduct arguably affected with a constitutional interest but proscribed by a statute, and there exists a credible threat of prosecution since Plaintiffs' alleged conduct is at least arguably forbidden by the pertinent law. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1076–77 (N.D. Fla. 2021) (citing sources). The FDP is properly positioned to "assert its own rights as a political party and also the rights of its candidates and voters." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078-79 (N.D. Fla. 2004).

Whether Defendants have yet enforced the Amended Law is of no moment. *See ACLU v. The*

*Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule."). Since Plaintiffs' injuries are "directly traceable to the passage" of the Amended Law, their injuries "would be redressed by enjoining each provision." *See Ga. Latino All. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012); *accord Support Working Animals v. DeSantis*, 457 F. Supp. 3d 1193, 1205 (N.D. Fla. 2020).

### B. Plaintiffs are entitled to injunctive relief

"A plaintiff seeking a preliminary injunction or temporary restraining order must establish four prerequisites: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Barnette v. Inch*, 2020 WL 1035249, at *1 (N.D. Fla. Jan. 30, 2020). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. CAGC v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Plaintiffs seek to maintain the status quo *before* the amendment's unconstitutional criminalization of freedoms went into effect.

### 1. Plaintiffs are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits. To assess the constitutionality of a state election law, the Court must "first examine whether it burdens rights protected by the First and Fourteenth Amendments." *Eu v. San Francisco Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989). "If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest . . . and is narrowly tailored to serve that interest." *Id.*

"Nothing could be more obvious than that a ballot becomes a public record once it is voted."

*Rogers v. Hood*, 906 So. 2d 1220, 1223 (Fla. 1st DCA 2005). Because voted ballots (including those which are subject to review by a canvassing board) are public records under Florida law, the Amended Law arguably criminalizes the "release" of "any information" about a public record. In a "government in which the citizenry is the final judge of the proper conduct of public business," "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official . . . records open to public inspection." *See Cox Broad. v. Cohn*, 420 U.S. 469, 495 (1975) (holding First Amendment protected media's truthful publication of court documents open to the public).

### a.     First Amendment – Freedom of Speech

"A State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'" *Eu*, 489 U.S. at 222 (1989) (quoting *Tashjian v. Republican Party*, 479 U.S. 208, 214 (1986)). A restriction on speech related to elections must "'not *significantly impinge* on constitutionally protected rights.'" *Citizens for Police Accountability v. Browning*, 572 F.3d 1213, 1221 (11th Cir. 2009) (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)) (emphasis added). Here, the Plaintiffs, as well as the FDP's members, candidates, and volunteers, have been chilled in their speech, leading to self-censorship and fear that any further speech may be subject to criminal sanction. Because the Amended Law facially restricts authorized observers from "releasing" their observations, it *does* significantly impinge upon their right of free speech.

"First Amendment freedoms are . . . essential to the maintenance of our democratic polity, which depends upon an informed citizenry to hold government officials accountable for error and abuse and to seek redress and change by lawful means." *Cooper v. Dillon*, 403 F.3d 1208, 1214 (11th Cir. 2005). "[O]ne of the primary purposes of the First Amendment is to 'protect the free discussion

of governmental affairs' because the maintenance of a responsible democratic government depends upon it." *Id.* (quoting *Landmark Comms., Inc.,* 435 U.S. 829, 838 (1978)).

"In the First–Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (citing *Jacobs v. The Florida Bar,* 50 F.3d 901, 904 (11th Cir. 1995)). "Rather, 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" *Wilson*, 132 F.3d at 1428 (quoting *N.H. Right to Life v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996)). "In such an instance, which is what is alleged here, the injury is self-censorship." *Wilson*, 132 F.3d at 1428 (citing *ACLU,* 999 F.2d at 1492).

Next, the Amended Law is also subject to strict scrutiny as a content-based restriction on speech. "Content-based laws—those that target speech based on its communicative intent—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2014); *accord Simon & Schuster v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 125 (1991); *accord See Cooper*, 403 F.3d at 1216.

The Amended Law's prohibition of the "release" of "any information about votes cast for or against any candidate or ballot measure or any results of any election" is a content-based restriction "because the purpose of the statute is to stifle speech of a particular content . . . ." *See Cooper*, 403 F.3d at 1216. "Because statutes representing governmental favoritism of preferred speech or suppression of disfavored speech are likewise antithetical to a free society, these content-based restrictions are also subjected to strict scrutiny." *Id*. Here, the Amended Law is neither narrowly tailored, nor does it satisfy a compelling interest. In *Cooper*, 403 F.3d at 1219, the Eleventh Circuit held first that strict scrutiny was appropriate, and second that the state had no compelling interest,

where a statute made it a misdemeanor for a participant in an internal investigation of a law enforcement officer to disclose any information obtained pursuant to the investigation before it becomes public record, because such prohibitions amounted to content based restrictions. *See id.* The Amended Law at issue presents the same sorts of constitutional problems and violates the First Amendment. *See id.*

### b.  First Amendment – Right to Petition the Government

The Amended Law violates the right to petition the government for redress of grievances. "[O]ur system of representative democracy depends upon an informed citizenry which can hold government officials accountable and can seek redress for grievances." *Cooper*, 403 F.3d at 1219. "[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. '[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" *Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). "The right to petition the Government is 'one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Floyd v. Miami-Dade*, 2017 WL 11568106, at *4 (S.D. Fla. May 18, 2017) (quoting *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017)). "The right to petition 'extends to all departments of the Government . . . .'" *Floyd*, 2017 WL 11568106, at *4 (quoting *Cal. Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

"[T]he rights of speech and petition share substantial common ground. . . . [T]he right to speak and the right to petition are 'cognate rights.'" *Duryea*, 564 U.S. at 388. "Both speech and petition are integral to the democratic process, although not necessarily in the same way. . . . [B]oth speech and petition advance personal expression, although the right to petition is generally concerned with expression directed to the government seeking redress of a grievance." *Id.*

"Depending on the facts, therefore, courts may apply speech-related tests to petition claims." *Jenner v. Sch. Bd.*, 2022 WL 1747522, at *1 (M.D. Fla. May 31, 2022). "[G]overnment action designed to keep a citizen from initiating legal remedies sometimes infringes upon the First Amendment right to petition the courts. . . . This right of court access cannot be impaired, either directly or indirectly." *In re Workers' Comp. Refund*, 46 F.3d 813, 822 (8th Cir. 1995). Here, the criminalization of protected speech prevents the initiation of legal remedies by chilling the free flow of information between the FDP and candidates on the one hand; and canvassing board observers (usually volunteers) monitoring the administration of the election on the other hand.

It is only through unfiltered communication that the FDP and candidates can meaningfully exercise their right to petition. Such communication is often necessary if a volunteer is to lodge an objection to a canvassing board's decisions. Similarly, such communication is also necessary if the FDP or a candidate is to file a lawsuit relating to a canvassing board's actions. Since the Amended Law chills communication, and therefore stifles the right to complain to public officials and to seek administrative and judicial relief, the Amended Law violates the First Amendment.

### c.      Fourteenth Amendment – Due Process

Plaintiffs are substantially likely to succeed on their claim that the Amended Law violates the Fourteenth Amendment's due process clause because it is vague and overbroad.

"'[A] vague law is no law at all,' as enforcement of a vague law violates our 'twin constitutional pillars of due process and separation of powers.' . . . 'Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them.'" *Dream Defs.*, 559 F. Supp. 3d at 1279 (citing sources). "'[T]he purpose of [this] requirement is to enable the ordinary citizen to conform his or her conduct to the law.'" *Id.* at 1279-80 (quoting *Chicago v. Morales*, 527 U.S. 41, 58 (1999)).

In this case, the Amended Law fails to give people of common intelligence fair notice of what the law demands of them, in violation of the Fourteenth Amendment. As just a few examples:

- Moscowitz does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite the fact that she has been a Harvard-educated attorney for more than 45 years, with most of her legal practice focused on the practice of criminal law, both as a federal prosecutor and as a criminal defense attorney. Moscowitz Decl. at ¶ 16.

- Planas does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite having served four terms in the Florida Legislature, having taught election law or state and local government law for seven years, and having been an attorney for more than 24 years, with a focus in election law. Planas Decl. at ¶ 19.

- And, FDP's Voter Protection Director does not know, and cannot predict, what Fla. Stat. § 101.5614(8) permits, nor what it prohibits and criminalizes, despite the fact that he is a Harvard-educated attorney who is well acquainted with Florida election law, having worked on the voter protection team's staff for multiple election cycles. Koplewicz Decl. at ¶ 17.

"Vague laws 'also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *Dream Defs.*, 559 F. Supp. 3d at 1280 (quoting *Chicago*, 527 U.S. at 58; *U.S. v. Hudson*, 7 Cranch 32, 34 (1812)). "But vague laws may leave 'relatively unaccountable police, prosecutors, and judges' empowered to *define* crimes, 'eroding the people's ability to oversee the creation of the laws they are expected to abide.'" *Dream Defs.*, 559 F. Supp. 3d at 1280. "The void-for-vagueness doctrine is based on 'at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Id.* (quoting *FCC v. Fox*, 567 U.S. 239, 253 (2012)).

"The standard for vagueness is particularly strict in the context of the First Amendment; '[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Dream Defs.*, 559 F. Supp. 3d at 1280 (citing, among other sources, *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [content-based

regulations of speech] ... raise[s] special First Amendment concerns because of its obvious chilling effect on free speech.")). "It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment." *Dream Defs.*, 559 F. Supp. 3d at 1280 (quoting *Winters v. New York*, 333 U.S. 507, 509 (1948)). "[G]overnment may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'" *Dream Defs.*, 559 F. Supp. 3d at 1280 (citing sources). "This special sensitivity to vagueness in the context of freedom of expression exists because '[v]ague laws force potential speakers to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech than intended." *Id.*

Where the Legislature has passed a vague law, "the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [the Legislature] to try again." *Id.* at 1282. In the case of a state statute which impermissibly violates the Fourteenth Amendment due to vagueness, this Court's "role is not to remedy the Florida Legislature's mistake, but to give the Legislature the opportunity to do so itself." *Id.*

First, the Amended Law is vague and overbroad since it is unclear who an "authorized" person is in that it arguably criminalizes speech about public meetings by members of the public, including FDP's members who are, ***and who are not***, participating in election oversight efforts. It may even be a felony for the public to discuss what they observe in public government meetings streamed and archived on the Internet because some canvassing board meetings are streamed live over Zoom. *E.g.,* **Exhibit M,** Broward, 10/17/22. And, some canvassing board meetings are even archived on government websites for the public to observe long after they have ended. *See* **Exhibit N**, Broward Canvassing Bd. Meeting Archive, https://www.browardvotes.gov/Canvassing-Board-

Meetings/Canvassing-Board-Meetings-Archives (last accessed Oct. 13, 2022). By contrast, Fla. Stat. § 101.5614(4)(a) says that "[u]pon request, a physically present candidate, a political party official, a political committee official, or an authorized designee thereof, must be allowed to observe the duplication of ballots . . . ." Does the Amended Law's lack of similar specificity mean anyone in the world who observes a public canvassing board meeting—even by streaming an archived meeting online—is "authorized to observe, review, or inspect ballot materials or observe canvassing"?

Second, it is unclear what "release" means. The dictionary defines "release" as "to give permission for publication, performance, exhibition, or sale of" and "to make available to the public." *Release*, Merriam-Webster, http://merriam-webster.com/dictionary/release, def. 4. (last accessed Oct. 15, 2022). Under the prior version of the law, it was clear that the prohibition on the "release" of results applied only to election officials publicly disclosing the results of an election. But the Amended Law's release prohibition extends beyond government officials to other authorized persons. It is unclear whether the word "release" might now be construed much more broadly than in the pre-amendment context, to include an observer's sharing of information with the public, or the political party, campaign, or candidate for whom they are volunteering. At least one lawyer for a supervisor of elections has informally advised that the law could be construed that broadly. Does a canvassing board volunteer expose herself to criminal liability by telling the party she is authorized to represent what she witnessed at the public meeting? Does she only expose herself to liability when she describes what she saw on social media or to a newspaper?

Third, the Amended Law is vague and overbroad because it is unclear whether its only temporally restrictive language – "before the closing of the polls in that county on election day" – applies just to the prohibition against the release of "any results of any election," or whether it also applies to the prohibition against the release of "any information about votes cast for or against any

candidate or ballot measure." The Amended Law says that any person "who releases any information about votes cast for or against any candidate or ballot measure or any results of any election before the closing of the polls in that county on election day commits a felony of the third degree." This language contains insufficient punctuation to reveal the meaning of the Legislature's chosen words. Grammatically, the temporal restriction may apply either only to the release of election results, or to every act the Amended Law prohibits.[1] If, after an election, a losing candidate falsely claims they lost because of canvassing irregularities, does a volunteer who observed the canvassing commit a felony by truthfully rebutting those claims with information about votes cast for or against the candidates?

Fourth, the Amended Law is both vague and overbroad because the phrase "any information about votes cast for or against any candidate or ballot measure" is unbounded, leading to absurd results. The language arguably encompasses communication of anything related to a canvassing board's action. Arguably, even the statement that a canvassing board accepted, as valid, every vote that came before it on a given day; or even simply that a canvassing board met and ruled on the validity of cast votes, could be construed as "any information about votes cast for or against any candidate or ballot measure." "[I]n its ambiguity, [the Amended Law] also consumes vast swaths of core First Amendment speech" because "the statute can also be read to criminalize other expressive activity." *See Dream Defs.*, 559 F. Supp. 3d at 1283.

---

[1] The rest of the statute fails to clear up the confusion. Other subsections not only discuss canvassing board proceedings which take place both *prior and subsequent* to the closing of the polls on Election Day, but subsection (4)(a) even references subsection (8)'s prohibition against premature release of election results without also discussing its other prohibitions. *Compare* Fla. Stat. § 101.5614(4)(a) (listing who "must be allowed to observe the duplication of ballots upon signing an affidavit affirming his or her acknowledgment that disclosure of election results discerned from observing the ballot duplication process while the election is ongoing is a felony, as provided under subsection (8)") with subsection (1) ("As soon as the polls are closed," the board "shall secure the voting devices" and "in the presence of members of the public desiring to witness the proceedings," verify number of ballots).

### 2.	Plaintiffs have a substantial threat of irreparable injury

There is a substantial threat of irreparable injury warranting injunctive relief. "An injury is 'irreparable only if it cannot be undone through monetary remedies.'" *S. Miami v. DeSantis*, 408 F. Supp. 3d 1266, 1306 (S.D. Fla. 2019) (quoting *Ne. Fla. CAGC*, 896 F.2d at 1285). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" justifying injunctive relief. *KH Outdoor v. Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quotations omitted); *accord Dream Defs.*, 559 F. Supp. 3d at 1285 (quoting *FF Cosmetics v. Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017)) ("An ongoing violation of the First Amendment constitutes an irreparable injury."). Additionally, the violation of a plaintiff's rights under the due process clause of the Fourteenth Amended has been found to establish irreparable harm. *See Dream Defs.*, 559 F. Supp. 3d at 1285; *S. Miami*, 408 F. Supp. 3d at 1306.

### 3.	The Threatened Injury To Plaintiffs Outweighs Potential Harm To The Defendants and an Injunction Will Not Disserve the Public Interest

"The final two factors for a preliminary injunction—damage to the opposing party and the public interest—are consolidated when the injunction is to be issued against the government." *Dream Defs.*, 559 F. Supp. 3d at 1286 (citing *Scott v. Roberts*, 612 F.3d 1279, 1280 (11th Cir. 2010)) ("When the state is a party, the third and fourth [preliminary injunction] considerations are largely the same."). Here, Plaintiffs satisfy these elements because the threatened harm to Plaintiffs, including FDP's members and candidates, clearly outweighs the potential harm to the Defendants. Moreover, injunctive relief will not disserve the public interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *S. Miami*, 408 F. Supp. 3d at 1308 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *S. Miami*, 408 F. Supp.

3d at 1307 (quoting *U.S. v. Ala.*, 691 F.3d 1269, 1301 (11th Cir. 2012)). "[B]ecause Plaintiffs' threatened injuries implicate the State's infringement upon significant constitutional and civil rights, a preliminary injunction that protects these rights pending a decision on the merits is in the public interest." *S. Miami*, 408 F. Supp. 3d at 1307-08 (citing *Ala.*, 691 F.3d at 1301). "The equities weigh in favor of enjoining those provisions that are preempted by federal law. The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *S. Miami*, 408 F. Supp. 3d at 1307 (quoting *Ala.*, 691 F.3d at 1281-82).

Absent injunctive relief, Plaintiffs will suffer irreparable harm since their speech will continue to be chilled under threat of criminal sanction as they work to oversee the proper administration of elections by canvassing boards, including during the 2022 General Election. *See S. Miami*, 408 F. Supp. 3d at 1307. Conversely, the Defendants will suffer no harm if injunctive relief is granted, not only because the State has no interest in enforcing an unconstitutional law, but also because the requested injunctive relief does not create any administrative burden.

## III.     CONCLUSION

WHEREFORE, Plaintiffs request an order (a) declaring Fla. Stat. § 101.5614(8) unconstitutional; and (b) preliminarily enjoining Defendants, their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control, and all other persons within the scope of Fed. R. Civ. P. 65, from investigating, prosecuting, or otherwise enforcing Fla. Stat. § 101.5614(8) (2022), in any way, including its provisions relating to "any . . . person authorized to observe, review, or inspect ballot materials or observe canvassing;" and (c) restoring the pre-amendment *status quo* by permitting enforcement only of the prior Fla. Stat. § 101.5614(8); and/or (d) requiring Defendants to show cause why all such relief should not issue; and (e) granting any other relief that is just and proper.

## CERTIFICATE IN SUPPORT OF
## REQUEST FOR EXPEDITED RELIEF

I HEREBY CERTIFY that this motion warrants expedited relief within the meaning of Local Rule 7.1(d)(2). County canvassing boards are scheduled to begin meeting across the State of Florida during the week of October 17, 2022. Although it may be too late to obtain relief before canvassing boards begin to meet across the state, canvassing boards will continue to meet for the remainder of the 2022 General Election. In order to stop the continued constitutional harm to the Plaintiffs for the remainder of the election, including the FDP's members and candidates, Plaintiffs respectfully request that the Court expedite the adjudication of this motion, so that a ruling is issued by Monday, October 24, 2022.

The issues raised and relief sought in this motion arguably warrant emergency relief. However, the undersigned counsel is cognizant of the fact that this lawsuit and motion were filed shortly before canvassing boards across the state are scheduled to meet, which makes proper certification of an emergency uncertain under Local Rule 7.1(d)(1). A major reason for the timing of the filing of this lawsuit is that the FDP sought to avoid the necessity of any lawsuit by requesting an advisory opinion on an expedited basis from the Department of State, Division of Elections, but the Division declined to issue an advisory opinion prior to the commencement of canvassing of the 2022 General Election.

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULE 7.1(a)(3)

I HEREBY CERTIFY that this motion complies with Local Rule 7.1(a)(3) because, as a motion for injunctive relief, this motion does not require pre-filing conferral.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2022, a true and correct copy of the foregoing

was served via e-mail to the individuals on the attached service list.

Respectfully submitted,

*Counsel for Plaintiffs*

/s/ Marc A. Burton
Marc A. Burton, Esq.
Florida Bar No. 95318
Richard J. Burton, Esq.
Florida Bar No. 179337
The Burton Firm, P.A.
2875 N.E. 191st Street, Suite 403
Aventura, Florida 33180
(305) 705-0888
pleadings@theburtonfirm.com
mburton@theburtonfirm.com
rb@theburtonfirm.com

and

Mark Herron, Esq.
Florida Bar No. 199737
Messer Caparello P.A.
2618 Centennial Place
Tallahassee, Florida 32308
(850) 222-0720
mherron@lawfla.com
*Application for Admission to the Southern*
*District of Florida Bar filed and pending*

**SERVICE LIST**

Marc A. Burton, Esq.
Richard J. Burton, Esq.
The Burton Firm, P.A.
2875 N.E. 191st Street, Suite 403
Aventura, Florida 33180
pleadings@theburtonfirm.com
mburton@theburtonfirm.com
rb@theburtonfirm.com
*Counsel for Plaintiffs*

Mark Herron, Esq.
Messer Caparello P.A.
2618 Centennial Place
Tallahassee, Florida 32308
mherron@lawfla.com
*Counsel for Plaintiffs*

Bradley M. McVay, Esq.
General Counsel
Florida Department of State
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399
brad.mcvay@dos.myflorida.com
*Counsel for Defendant Cord Byrd,*
*in his official capacity as Florida Secretary of State*

Defendant Ashley Moody
via the Office of the Attorney General
PL-01 The Capitol
400 South Monroe Street
Tallahassee, Florida 32399
oag.civil.eserve@myfloridalegal.com
*Counsel for Defendant Ashley Moody,*
*in her official capacity as Florida Attorney General*